01

02

03

04

05

06

07              UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF WASHINGTON
08                    AT SEATTLE

09   MICHAEL JOHN DINGMAN,             )   Case No.: C04-2360-MJP
                                       )
10          Plaintiff,                 )
                                       )
11   v.                                )   REPORT AND RECOMMENDATION
                                       )
12   JO ANNE B. BARNHART,              )
     Commissioner of Social Security,  )
13                                     )
            Defendant.                 )
14   _____ )

15          Plaintiff Michael Dingman proceeds through counsel in his appeal of a final decision of the

16   Commissioner of the Social Security Administration (the "Commissioner").  After a hearing before

17   an Administrative Law Judge ("ALJ"), the Commissioner denied Plaintiff's application for

18   supplemental security income ("SSI") and disability insurance benefits ("DIB") under Titles XVI

19   and II of the Social Security Act.  For the reasons set forth below, the Court recommends that the

20   Commissioner's decision be reversed and remanded for an award of benefits.

21                       I.  FACTS AND PROCEDURAL HISTORY

22          Plaintiff is a 48-year-old father of three teenage children.  AR 472. [1]  He has a formal

23   education through at least the sixth grade, attending special education classes, but is functionally

24   illiterate.  AR 95, 310, 619.  Plaintiff has held jobs primarily in the construction industry where,

25   _____

26      [1] "AR" refers to the Administrative Record, filed November 2, 2004.

REPORT AND RECOMMENDATION
PAGE -1

01   among other things, he built and installed cabinets.  AR 90, 408-10, 472.  Plaintiff has also

02   attempted, but failed, to work as a dishwasher and cook.  AR 641.

03        Plaintiff applied for DIB and SSI in March and April of 1999, respectively.  In his

04   applications, plaintiff alleged disability arising from pain in the right wrist and hand, back problems,

05   gastric distress, learning disabilities/illiteracy, anxiety, and hearing loss.  AR 81-83, 89, 116, 357-

06   60.

07        A hearing was held before an ALJ on July 25, 2000, but an error in the Disability

08   Determination Services ("DDS") evaluation led the ALJ to remand the case for reevaluation of

09   plaintiff's alleged mental retardation, anxiety, back, right wrist and hearing impairments.  AR 373-

10   74.  Following a second review and denial by DDS, another administrative hearing was held on

11   November 5, 2001.  AR 31-42.  At that hearing, the ALJ determined at step 3 of the evaluation

12   process that the plaintiff was not entitled to a 12.05(C) mental retardation Listing.  In addition, at

13   step 5 of the evaluation process, the ALJ found that although the plaintiff was not capable of

14   performing his prior work, he was capable of performing other work available in significant

15   numbers in the national economy and therefore the plaintiff was not disabled.  AR 41-42.  Plaintiff

16   timely requested the Appeals Council ("AC") to review the decision, but that request was denied.

17   AR 24-26.  The AC denied a subsequent request as well.  AR 12-15.  The ALJ's November 5,

18   2001 decision therefore became the Commissioner's final decision for purposes of review.  Plaintiff

19   timely sought review of the decision with this Court.  Dkt. No. 1.

20                              II.  JURISDICTION

21        The Court has jurisdiction to review the ALJ's decision pursuant to 42 U.S.C. §§ 405(g)

22   and 1383(c)(3).

23                         III.  STANDARD OF REVIEW

24        The court may set aside the Commissioner's denial of social security benefits when the

25   ALJ's findings are based on legal error or not supported by substantial evidence in the record as

26   a whole.  *See* 42 U.S.C. 405(g); *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993); *Smolen v.*

REPORT AND RECOMMENDATION
PAGE -2

01  *Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).  Substantial evidence is defined as more than a mere

02  scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might

03  accept as adequate to support a conclusion.  *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir.

04  1989).  The ALJ is responsible for determining credibility, resolving conflicts in medical testimony,

05  and for resolving ambiguities.  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).  Where

06  the evidence is susceptible to more than one rational interpretation, it is the Commissioner's

07  conclusion that must be upheld.  *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

08        The Court has discretion to remand for further proceedings or to award benefits.   *See*

09  *Marcia v. Sullivan*, 900 F.2d 172, 176 (9th Cir. 1990).  The Court may direct an award of benefits

10  where "the record has been fully developed and further administrative proceedings would serve

11  no useful purpose."  *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002).

12        Such a circumstance arises when: (1) the ALJ has failed to provide legally
        sufficient reasons for rejecting the claimant's evidence; (2) there are no outstanding
13        issues that must be resolved before a determination of disability can be made; and
        (3) it is clear from the record that the ALJ would be required to find the claimant
14        disabled if he considered the claimant's evidence.

15  *Id*. at 1076-77.

16                    IV.  EVALUATING DISABILITY

17        The claimant bears the burden of proving that he is disabled within the meaning of the

18  Social Security Act.  *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999).  Disability is defined

19  as the "inability to engage in any substantial gainful activity by reason of any medically

20  determinable physical or mental impairment, which can be expected to result in death, or which

21  has lasted or can be expected to last for a continuous period of not less than twelve months[.]"

22  42 U.S.C. § 423 (d)(1)(A).  A claimant is disabled only if his impairments are of such severity that

23  he is not only unable to do his previous work, but cannot, considering his age, education, and work

24  experience, engage in any other substantial gainful activity existing in the national economy.  *See*

25  42 U.S.C. §§ 423(d)(2)(A), 1382(c)(a)(3)(B); *See also Tacket v. Apfel*, 180 F.3d 1094, 1098-99

26  (9th Cir. 1999).  The Social Security regulations set out a five-step sequential evaluation process

REPORT AND RECOMMENDATION
PAGE -3

01  for determining whether a claimant is disabled within the meaning of the Social Security Act.  *See*

02  20 C.F.R. §§ 404.1520, 416.920.  At step 1, the claimant must establish that he or she is not

03  engaging in any substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant

04  establishes that they have not engaged in any substantial gainful activity, the Commissioner

05  proceeds to step 2.  At step 2, the claimant must establish that he or she has one or more medically

06  severe impairments or combination of impairments that limit their physical or mental ability to do

07  basic work activities.  If the claimant does not have such impairments, he or she is not disabled.

08  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the claimant does have a severe impairment, the

09  Commissioner moves to step 3 to determine whether the impairment meets or equals any of the

10  listed impairments described in the regulations.  20 C.F.R. §§ 404.1520(d), 416.920(d).  A

11  claimant who meets or equals one of the listings for the required twelve month duration

12  requirement is disabled.  *Id.*

13      When the claimant's impairment neither meets nor equals one of the impairments listed in

14  the regulations, the Commissioner must proceed to step 4 and evaluate the claimant's residual

15  functional capacity ("RFC").  20 C.F.R. §§ 404.1520(e), 416.920(e).  Here, the Commissioner

16  evaluates the physical and mental demands of the claimant's past relevant work to determine

17  whether the claimant can still perform that work.  *Id.*  If the claimant is not able to perform his or

18  her past relevant work, the burden shifts to the Commissioner at step 5 to show that the claimant

19  can perform some other work that exists in significant numbers in the national economy, taking

20  into consideration the claimant's RFC, age, education, and work experience.  20 C.F.R. §§

21  404.1520(f), 416.920(f); *Tackett*, 180 F.3d at 1100.  If the Commissioner finds the claimant is

22  unable to perform other work, then the claimant is found disabled and benefits may be awarded.

23                          V.  <u>DECISION BELOW</u>

24      In a decision dated November 5, 2001, the ALJ found that the plaintiff was not disabled

25  within the meaning of the Social Security Act.  AR 31-42.  Some of his specific findings include:

26

REPORT AND RECOMMENDATION
PAGE -4

1)   The claimant has a chronic low back strain with mild degenerative disc changes, a learning disorder including reading disorder, math disorder, written expression and expressive language disorder, a borderline IQ, an organic brain syndrome, an anxiety disorder NOS and alcohol dependence in early remission. These impairments are severe, but they do not meet or equal the criteria of any impairments listed in Appendix 1, Subpart P, Regulations No. 4.

2)   The claimant's statements concerning his impairments and their impact on his ability to work are not entirely credible in light of the medical reports and other evidence of record.

3)   The claimant retains the residual functional capacity to perform light work. He can do simple, repetitive work, routine in nature, and he can relate to co-workers and supervisors on a limited interactive and superficial basis.

4)   The limitations posed by the claimant's residual functional capacity prevent him from performing his past relevant work.

5)   The claimant . . . is functionally illiterate.

6)   Based on his residual functional capacity, and the claimant's age, educational background, and work experience, 20 C.F.R. §§ 404.1569 and 416.969, and Rule 202.16 of Table 2, Appendix 2, Subpart P, Regulations No. 4, would direct a conclusion of "not disabled."

7)   Although the claimant is unable to perform the full range of light work, he is capable of performing other unskilled work that exists in substantial numbers. Such work includes positions such as handpacker (DOT 492.058-018) with 13,000 state jobs and 677,000 jobs nationally, seedling worker (DOT 451.687-022) with 300 state jobs and 8,500 jobs nationally; and bakery worker (DOT 524.687-022) with 1,300 state jobs and 69,000 jobs in the national economy. If the claimant were capable of only sedentary work, other jobs he could perform include small products assembler (DOT 706.684-022) with 1,400 jobs in the state and 72,000 jobs nationally, and hand packager (DOT 492.058-018), with 71,000 jobs in the national economy. A finding of "not disabled" is therefore reached within the framework of the above-cited rules.

AR 41-42.

## VI.  ISSUES ON APPEAL

The plaintiff broadly phrases the "legal issue" on appeal as whether the Commissioner's final decision is supported by substantial evidence and whether the correct legal standards were applied. The plaintiff's brief raises a number of issues claiming error. There are three which require remand in this case. These are:

REPORT AND RECOMMENDATION
PAGE -5

01     (A)    Did the ALJ err in his assessment of the severity of the plaintiff's
02  impairments (Finding 1 above and Step 2 in the disability evaluation process)?

03     (B)    Did the ALJ err in concluding that the plaintiff's impairment did not meet
04  or exceed the impairments listed in Listing 12.05(C) (Finding 1 above, and Step 3 in the disability evaluation process)?

05     (C)    Did the ALJ err in concluding that the plaintiff could perform some other
06  work that exists in significant numbers in the national economy, taking into consideration the claimant's RFC, age, education, and work experience
07  (Finding 7 above and Step 5 in the disability evaluation process)?

08  It is the opinion of this Court that the errors at step 3 and step 5 require remand for the award of

09  benefits. If, however, the ultimate decision is to remand back to the Commissioner for less than

10  an award of benefits, the Commissioner should also be directed to correct the error committed at

11  step 2, which would require only a remand for further proceedings.

12                                       VII. <u>DISCUSSION</u>

13       A. <u>The ALJ Erred in His Step 2 "Severity" Analysis.</u>

14        The ALJ found plaintiff to suffer from the severe impairments of low back strain with

15  degenerative disc disease, a variety of learning disorders, a "borderline IQ," "organic brain

16  syndrome," "anxiety disorder NOS," and alcohol dependence in early remission. AR 33. He also

17  found plaintiff to have "deconditioned status." AR 33. The ALJ, however, rejected plaintiff's

18  assertions that his other alleged impairments were severe. AR 34. Plaintiff argues that the ALJ

19  erred by failing to find several of his impairments "severe." Dkt. No. 12. He argues that the ALJ

20  should have found his tendinitis, arthritis, trigger thumb, gastrointestinal problems, high blood

21  pressure, vision problems, depression, fecal incontinence and hearing loss to be severe impairments

22  and should thus have included them in his RFC analysis. Dkt. No. 12.

23        The step 2 inquiry is a "*de minimis* screening device to dispose of groundless claims."

24  *Smolen,* 80 F.3d at 1290 (internal citations omitted). It requires plaintiffs to prove that they have

25  a "severe" impairment or combination of impairments. 20 C.F.R. §§ 404.1520(c), 416.920(c).

26  An impairment is severe if it significantly limits the plaintiff's ability to perform basic work

REPORT AND RECOMMENDATION
PAGE -6

01  activities.  20 C.F.R. §§ 404.1521(a), 416.921(a).[2]  This analysis requires the ALJ to consider the

02  combined effect of all of the claimant's impairments on his ability to function, regardless of

03  whether each individual impairment is sufficiently severe.  *Smolen*, 80 F.3d at 1289-90.  When an

04  impairment is not expected to cause death, it must persist or be expected to persist for a

05  continuous period of at least twelve months.  20 C.F.R.  §§ 404.1509, 416.909.  An impairment

06  is not severe if it consists only of a "slight abnormality" (or a combination of slight abnormalities)

07  that has no more than a minimal effect on the ability to do basic work activities.  SSR 96-3p, 1996

08  WL 374181 at *1 (S.S.A. 1996); *see also Smolen*, 80 F.3d at1289-90.

09          The ALJ's determination that plaintiff's gastritis and hearing loss were not severe is

10  supported by substantial evidence.  With respect to his gastritis, the ALJ observed that medication

11  and plaintiff's abstention from drinking had improved his condition with good results.  AR 33.

12  Indeed, plaintiff testified to this at the November hearing.  AR 644.  The ALJ thus concluded that

13  there were no indications of any "significant vocational limitations."  AR 33.  The ALJ also

14  recognized evidence tending to show plaintiff suffered some hearing loss, but observed that the

15  evidence showed he could understand normal conversations and communicate adequately in a

16  quiet room.  AR 33.  He also noted that doctors opined that hearing aids could improve plaintiff's

17  hearing.[3]  AR 33.  The ALJ thus properly concluded that plaintiff's gastritis and hearing loss did

18  not significantly impair his ability to perform basic work activities and thus did not constitute

19  severe impairments.  AR 33.

20          The ALJ also considered evidence regarding arthritis, tendinitis, and carpal tunnel

21  syndrome in plaintiff's left wrist, and properly determined that the alleged impairments were not

22  _____

23          [2]Basic work activities include the abilities and aptitudes necessary to do most jobs including

24  walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, understanding, carrying out and remembering simple instructions, and dealing with changes in a routine work setting.  *See* 20 C.F.R. §§ 404.1521(b), 416.921(b).

25

26          [3]Plaintiff actually had a hearing aid at one point, but lost it.  It is unclear whether he has obtained another.  AR 638.

REPORT AND RECOMMENDATION
PAGE -7

01  severe. AR 33. Evidence from 1998 showed that plaintiff was diagnosed with right wrist carpal

02  tunnel and arthritis. AR 265, 278. Other evidence, however, showed that there was no evidence

03  of carpal tunnel, and a 2001 examination at the UW Physicians clinic revealed plaintiff had a

04  normal range of movement and no tenderness or swelling. AR 503. The ALJ's determination that

05  plaintiff's wrist problems were not severe was based on several doctors' findings and is supported

06  by substantial evidence. AR 33-34. It should be upheld.

07      The ALJ's determination that plaintiff's high blood pressure, vision problems, depression,

08  fecal incontinence, and other alleged impairments were not severe, however, was deficient. AR

09  34. Specifically, he stated that "[o]ther symptoms or conditions appear in the record from time

10  to time, [sic] there is no evidence that they were more than transient or caused significant

11  vocational limitations. Any such impairment is not severe." AR 34. With respect to plaintiff's

12  high blood pressure, evidence from Dr. Ordoubadi indicated that it caused plaintiff "marked"

13  limitations, yet the ALJ did not address it. AR 175-76. Evidence in the record also diagnoses

14  plaintiff with his other alleged impairments, and though it is not clear how long each of them

15  lasted, nor that they had any significant limitations on plaintiff's ability to perform basic work

16  activities, the ALJ's conclusory dismissal of them was improper. AR 34. The ALJ's failure to

17  comment on any of this evidence "leaves this court with a record insufficient for a meaningful

18  appellate review." *Macri v. Chater*, 93 F.3d 540, 545 (9th Cir. 1996) (Norris, J., dissenting)

19  (internal citations omitted). The ALJ's decision to summarily reject these impairments and his

20  failure to consider their cumulative impact was in error. If remand is ultimately ordered for less

21  than calculation of full benefits, the Commissioner also should evaluate each of these alleged

22  impairments individually and cumulatively.

23      B. <u>The ALJ Erred in Failing to Find Plaintiff Satisfied a 12.05(C) Listing at Step 3</u>.

24      Step 3 of the sequential evaluation process requires the ALJ to determine whether

25  plaintiff's impairment meets or equals any of the listed impairments described in the regulations.

26  20 C.F.R. §§ 404.1520(d), 416.920(d). The listings describe specific impairments in each of the

01 body's major systems that are considered "severe enough to prevent a person from doing most

02 gainful activity." *See* 20 C.F.R. §§ 404.1525, 416.925(a).   Severe impairments must be

03 "permanent or expected to result in death," or must last or be expected to last for a continuous

04 period of at least twelve months. 20 C.F.R. §§ 404.1525(a), 416.925(a). The ALJ's analysis at

05 step 3 must rely only on medical evidence and not rely on age, education or work experience. 20

06 C.F.R. §§ 404.1520(d), 416.920(d); *see also Bates v. Barnhart*, 222 F. Supp. 2d 1252, 1258 (D.

07 Kan. 2002).   To be found disabled at step 3, plaintiff must prove that he meets or equals each of

08 the characteristics of a listed impairment.  20 C.F.R. §§ 404.1525(a), 416.925(a); *See Burch v.*

09 *Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005).  When a plaintiff suffers from multiple impairments

10 and none of them individually satisfies a listing, an ALJ must consider the collective symptoms,

11 signs, and laboratory findings of all of the claimant's impairments to determine whether plaintiff

12 meets a listing. *See Marcia*, 900 F.2d at 176.

13       Plaintiff argues that the ALJ erred by finding that he did not meet the 12.05(C) Listing, 20

14 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C), for mental retardation at step 3 of the sequential

15 evaluation process. Dkt. No. 12. He argues that his scores on several mental evaluations satisfied

16 the Listing's requirement and that he should therefore have been found disabled. Dkt. Nos. 12,

17 16. The Commissioner responds that the ALJ properly evaluated the evidence. Dkt. No. 15.  She

18 argues that the plaintiff did not meet the 12.05(C) Listing because there was no specific mental

19 retardation diagnosis and because the ALJ found that he had no deficits in adaptive functioning

20 that manifested themselves before the age of 22.

21       The 12.05(C) Listing describes mental retardation as a condition characterized by

22       significantly subaverage general intellectual functioning with deficits in adaptive
23       functioning initially manifested during the developmental period; i.e. . . . before the
         age of 22.  The required level of severity for this disorder is met when the
24       requirements in A, B, C, or D are satisfied . . .

25       C.  A valid verbal, performance, or full scale IQ of 60 *through* 70 and a physical
         or other mental impairment imposing an additional and significant work-related
26       limitation of function.

REPORT AND RECOMMENDATION
PAGE -9

01  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 (emphasis added).

02      Thus, a 12.05(C) Listing requires an ALJ to find plaintiff satisfies three elements:  (1) a

03  valid verbal IQ score of 60-70; (2) a physical or other mental impairment; and (3) subaverage

04  general intellectual functioning with evidence of adaptive functioning deficits that manifested

05  themselves before the age of 22.  The Commissioner argued in her brief and at oral arguments that

06  there is an additional requirement that plaintiff also be specifically diagnosed as "mentally

07  retarded."  Dkt. No. 15.

08              1.  The Plaintiff's IQ Scores Satisfied the 12.05(C) Severity Requirement.

09      In this case, plaintiff took several intelligence tests.[4]  The Wechsler IQ test yielded a verbal

10  IQ score of 70.[5]  AR 243.  The plaintiff also scored a 58 on the Peabody Picture Vocabulary Test.

11  AR 230, 645.  The ALJ acknowledged that the Wechsler IQ test score was a "borderline" score

12  for purposes of the regulations, but found there was other evidence, discussed below, that

13  precluded a finding of a 12.05(C) mental retardation Listing.  AR 34, 37-39.

14      Norman Gustavson, Ph.D., the medical expert called by the ALJ, testified that the Peabody

15  Picture Vocabulary Test score would mean that the plaintiff was "moderately retarded."  AR 645.

16  He nevertheless suggested throwing out the Peabody Picture score, "because that 58 doesn't jive

17  with the more reliable Wechsler score."  AR 646.  This is what the ALJ did.  AR 37.  Because the

18  regulations require the ALJ to consider the lowest IQ result in the Wechsler series, however,

19  plaintiff's verbal IQ of 70 falls within the range set forth by 12.05(C).  20 C.F.R. Pt. 404, Subpt.

20  P, App. 1, § 12.00(D)(6)(c).  Plaintiff therefore satisfied the first prong of 12.05(C)'s severity

21  requirement.

22  _____

23      [4]The regulations indicate that broad based IQ tests such as the Wechsler series are the

24  preferable test method.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(6)(c).  They also state
    that the Peabody Picture Vocabulary Test may also be appropriate.  *Id.* at § 12.00(D)(6)(d).

25      [5]"Where verbal, performance, and full scale IQs are provided in the Wechsler series, we

26  use the lowest of these in conjunction with 12.05."  20 C.F.R. Pt. 404, Subpt. P, App. 1,
    § 12.00(D)(6)(c).  Here, plaintiff's lowest score was the 70 on the verbal.  AR 243.

REPORT AND RECOMMENDATION
PAGE -10

2.   <u>The record is undisputed that plaintiff suffered from "an additional and significant work-related limitation of function."</u>

An impairment satisfies this requirement when its impact on a claimant's ability to perform basic work activities is more than slight or minimal. *Fanning v. Bowen*, 827 F.2d 631, 633 (9th Cir. 1986) (internal citations omitted). A step 2 finding of a severe impairment therefore satisfies this test. *Id.* at n.3 (emphasizing, however, that a specific severity finding is not required to satisfy this standard). Here, the record is undisputed that the plaintiff had physical impairments in addition to his alleged mental retardation. Among other things, the ALJ found plaintiff to suffer from degenerative disc disease and anxiety disorder, two impairments that by definition imposed significant limitations on plaintiff's ability to work. AR 33. Indeed, the plaintiff was unable to return to his former work because of these impairments. AR 42. Thus, plaintiff also satisfied 12.05(C)'s requirement that he suffer from a "physical or other mental impairment imposing an additional and significant work-related limitation or function."

3.   <u>The plaintiff had significant subaverage general intellectual functioning and deficits of adaptive functioning that manifested themselves before the age of 22.</u>

A 12.05(C) Listing of mental retardation requires the ALJ to find that plaintiff has "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested . . . before the age of 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. While the Ninth Circuit has not yet spoken on what satisfies this diagnostic requirement, other circuits have found IQ to be an important indicator of subaverage intellectual functioning. Additionally, when determining whether claimants demonstrate deficits in adaptive functioning, courts look to a variety of factors that focus on the claimant's ability to lead an independent life.

a.   <u>Plaintiff's IQ demonstrates subaverage intellectual functioning manifesting before the age of 22.</u>

IQ scores are a common indicator of subaverage intellectual functioning. Several circuits find that plaintiffs create a rebuttable presumption that their developmental IQ was the same as

REPORT AND RECOMMENDATION
PAGE -11

01  their current IQ when they present a valid IQ score from their post-developmental period.  *See,*

02  *e.g.*, *Branham v. Heckler*, 775 F.2d 1271, 1274 (4th Cir. 1985) (absent contrary evidence, an IQ

03  test taken after the insured period correctly reflects claimant's IQ during the insured period);

04  *accord* Luckey v. U.S. Dep'. of Health & Human Srvs., 890 F.2d 666, 668-69 (4th Cir. 1989)

05  (courts should assume IQ remains constant and that an absence of an IQ test during the

06  developmental period does not preclude a finding of retardation); *see also Guzman v. Bowen*, 801

07  F.2d 273, 275 (7th Cir. 1986) (per curiam) (IQ test taken after expiration of insured period

08  sufficient to establish IQ during insured period); *Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir.

09  2001) presuming that a person's IQ remain stable over time in the absence of any change in

10  intellectual functioning); *but see Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001) (upholding

11  ALJ's finding that claimant was not retarded, in part because plaintiff's IQ testing was not

12  contemporaneous with her developmental period); *Markle v. Barnhart*, 324 F.3d 182, 188 (3d Cir.

13  2003) (declining to create such a presumption).  The Eleventh Circuit has gone further to find that

14  claimants presumptively meet the 12.05(C) disability requirements when they present a valid IQ

15  score and evidence of an additional impairment.  *Hodges v. Barnhart*, 276 F.3d 1265, 1268-69

16  (11th Cir. 2001).

17          Courts that use evidence of mental retardation from the post-developmental period to raise

18  a rebuttable presumption that the condition existed during the developmental period implicitly base

19  their decisions on the medical fact that, absent some traumatic event, intelligence remains fairly

20  constant throughout one's life.  *See, e.g.*, *Hodges*, 276 F.3d at 1268-69.

21          The Commissioner's own explanation of the 12.05(C) Listing supports this interpretation.

22  In the Federal Register, the Commissioner acknowledged that intelligence testing from the

23  development period should not be required to satisfy the 12.05(C) Listing.  According to the

24  Commissioner, the Social Security Administration does "not necessarily require evidence from the

25  developmental period to establish that the impairment began before the end of the developmental

26  period" and has "always interpreted [the term "manifested"] to include the common clinical

REPORT AND RECOMMENDATION
PAGE -12

01  practice of inferring a diagnosis of mental retardation when the longitudinal history and evidence

02  of current functioning demonstrate that the impairment existed before the end of the developmental

03  period."  Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury,

04  65 Fed. Reg. 50,776-01, 50,753, 50,772 (Aug. 20, 2000) (to be codified at 20 C.F.R. §§ 404, 416.

05  This Court believes the rationale adopted in *Hodges* is the correct interpretation of the regulations

06  and adopts it.

07      Here, plaintiff's IQ scores indicate that he was presumptively mentally retarded during his

08  developmental years.  The Wechsler standardized test IQ, administered many years after the age

09  of 22, scored his verbal IQ at 70.  AR 243.  Another test administered in 2000 scored his IQ at 58.

10  AR 230.  Moreover, Dr. Gustavson, the psychologist who was the medical expert called by the

11  ALJ to testify at the hearing, acknowledged that the plaintiff would have had the same IQ as a

12  child, since IQ is relatively stable.  AR 668.  These facts constitute substantial evidence that

13  plaintiff manifested "evidence of significantly subaverage intellectual functioning" during his

14  developmental period.

15              b.    Plaintiff demonstrated deficits in adaptive functioning.

16      When determining whether claimants demonstrate deficits in adaptive functioning, courts

17  look to a variety of factors that focus on the claimant's ability to lead an independent life.  For

18  instance, the Eastern District of Washington has emphasized that a claimant's participation in

19  special education classes can be indicative of deficits in adaptive functioning.  *See Ware ex rel. v.*

20  *Shalala*, 902 F. Supp. 1262, 1271 (E.D. Wash. 1995).  The Third Circuit has also indicated that

21  a claimant's participation in special education, poor academic performance, and low-skilled work

22  history imply evidence of deficits in adaptive functioning during the developmental period.  *See*

23  *Markle*, 324 F.3d at 189 (remanding for further development of these factors).  The Sixth Circuit

24  has found a claimant's work as an accounting clerk at a bank to be evidence of an ability to

25  perform "relatively complicated tasks" that is incompatible with the 12.05(C) requirements.

26  *Foster*, 279 F.3d at 355.  Moreover, the Commissioner's comments on the Listing requirements

01  for 12.05(C) indicate these inquiries are accurate.  It indicates that 12.05(C) accommodates the

02  American Psychiatric Association's analysis of mental retardation, which looks to an individual's

03  ability to function academically, care for themselves, and live independently.  Technical Revisions

04  to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20,018, 20,022 (April 24, 2002)

05  (to be codified at 20 C.F.R. Pt. 404).

06        In this case, the plaintiff demonstrated deficits in adaptive functioning before the age of 22.

07  Plaintiff was placed in special education classes from the age of six until he left school in the sixth

08  grade.  AR 95, 619.  He dropped out of school at that point because his family moved to a state

09  that did not have special education classes.  AR 95, 619.  Despite attempts, he was never able to

10  learn to read and remains functionally illiterate.  AR 657.  He also has such limited math skills that

11  he has difficulty determining whether he received proper change at the store.  AR 619.  Plaintiff's

12  ability to live independently is also minimal.  He is divorced and lives with his two teenage

13  children.  He testified that he has custody, in large part, because his wife is a drug addict.  AR 622-

14  26.  His children do most of the housework and shopping.  AR 622-24.

15        Plaintiff's work history also demonstrates evidence of deficits in adaptive functioning.

16  Plaintiff did hold a job for several years, but it was as a construction laborer job requiring heavy,

17  repetitive work that he learned over the course of many years from his uncle.  AR 597-98, 628-29.

18  He earned a good livelihood in the late 1980's when a friend handled all the paperwork, and he did

19  the heavy labor.  When his friend stopped helping him, however, the business collapsed.  AR 636.

20  When he was no longer able to do this kind of work due to his back impairment, he tried simple,

21  unskilled jobs, such as dishwashing, but was unable to keep any of them.  He has lost all of the jobs

22  he was hired to do since that time and has had no earnings since 1989.  AR 87, 634-35.  Together,

23  plaintiff's IQ, educational history, social functioning, and work history demonstrate that he meets

24  the diagnostic requirements of the 12.05(C) Listing.

25              c.    The ME's opinion was deficient.

26

REPORT AND RECOMMENDATION
PAGE -14

01    The ALJ relied heavily on the ME's opinion to support his finding that there was no

02 evidence of deficits in adaptive functioning that manifested themselves before the age of 22.  AR

03 38.  Unfortunately, the ME offered only a cursory analysis regarding deficits of adaptive

04 functioning.  He based his analysis on the fact that, for a period of time, the plaintiff, as an adult,

05 was employed.  AR 38.

06    The record, however,  indicates that the plaintiff only performed one kind of work as an

07 adult, that of a construction laborer working with cabinets and trim.  This was a hands-on trade

08 he learned from his uncle over the course of many years.  AR 597-98, 628-29.  As noted above,

09 he earned a good livelihood until his friend, who handled all of the paperwork, quit.  AR 636.

10 When he was no longer able to do this kind of work due to his back impairment, he tried simple,

11 unskilled jobs, such as dishwashing, but was unable to keep any of them.  He has had no earnings

12 since 1989.  AR 87, 634-35.  Plaintiff's ability to perform a single, repetitive job learned over the

13 course of years is insufficient to disregard the evidence of plaintiff's mental limitations and deficits

14 in adaptive functioning.

15    The superficiality of the analysis offered by the ME is further highlighted by the fact that

16 he testified that he was not familiar with some of the standardized tests administered to plaintiff.

17 AR 647.  Notwithstanding his lack of familiarity with some of the standardized tests, he concluded

18 that the plaintiff's condition did not amount to a 12.05 (C) Listing.  As he stated at the hearing:

19          Now does that all add up to a listing?  Well, from a psychological standpoint,
           there's not enough in the record to add up to a listing.  I wish I had a little better
20         measure if he had some–if he really has a severe learning disability, because that's
           certainly not clear, whatever this doctor of education gives it.

21

22 AR 648.

23    This "doctor of education" was Sandra Meggert, Ph.D., an examining psychologist, who

24 administered a battery of psychological tests, and who concluded that the plaintiff showed

25 evidence of severe learning difficulties, extreme difficulty detecting and discriminating letter, word

26 or phrase similarities and interpreting meaning; difficulty clearly discriminating distinct differences

REPORT AND RECOMMENDATION
PAGE -15

01  in words and information presented orally; a propensity to misunderstand what is said and come

02  to different conclusions or outcomes based on his interpretation; sequencing oral and

03  organizational difficulties; significant short-term memory difficulties; visual-motor difficulties

04  primarily involving writing or copying printed materials; extreme difficulty to inability to perform

05  basic math skills; and an inability to perform tasks involving basic reading skills, reading

06  comprehension, basic writing skills and written expression and difficulty with verbal expression.

07  AR 236-37.

08      Moreover, the ME initially testified that plaintiff would not meet Listing 12.05(C)

09  because his IQ was not below 70.  AR 651.  The ALJ had to explain to the ME that a claimant

10  could meet the Listing with and IQ of 60 through 70.  AR 651.  The ME then testified that the

11  plaintiff could not meet the Listing, because he had an IQ of 73.  AR 651.  Again, the ALJ had

12  to explain that the lowest score was to be used for 12.05(C) Listing purposes, in this case, the

13  plaintiff's verbal score of 70.  AR 651.  The ME then resorted to saying that, because the plaintiff

14  earned a good living during part of his adult years, he did not have deficits of adaptive

15  functioning.  When the ALJ explained that the deficit analysis should focus on manifestation

16  before the age of 22, the ME simply repeated that, because the plaintiff was able to earn a living

17  during part of his adult life, he did not have deficits of adaptive functioning.  AR 652.

18      Ultimately, although offering a final conclusion about whether the plaintiff met the

19  12.05 (C) Listing requirements, the ME revealed the limits of his ability to opine regarding the

20  extent of the impairment suffered by the plaintiff.

21      Q:    So he doesn't meet 12.05?

22      A:    No.

23      Q:    So--

24      A:    Well, in addition to the things that I pointed out, and I don't feel
25            very comfortable – I don't think it's appropriate for me to make
            a diagnosis, just sort of on a limited basis.  I mean I didn't even
            interview him, so I'd be hard put to – I think he demonstrated at
26            least some traits of avoidant and dependent personality disorder,

REPORT AND RECOMMENDATION
PAGE -16

01
02

but they don't rise to the level of meeting a listing.  I'm not an orthopedist, but we do have the – under the somatoform disorders, somatoform pain disorder.

AR 653.

03

04        Despite the shortcomings of the ME's testimony, the ALJ adopted his conclusory

05   reasoning.  In doing so, the ALJ ignored contrary medical evidence from the plaintiff's treating

06   and examining psychologists.  Because treating physicians are employed to cure and thus have

07   a greater opportunity to know and observe the patient as an individual, their opinions are given

08   greater weight than the opinions of other physicians.  *Rodriguez v. Bowen*, 876 F.2d 759, 761

09   (9th Cir. 1989).  A treating physician's opinion, however, is not necessarily conclusive as to either

10   a physical condition or the ultimate issue of disability.  *Id.* at 761-62 & n.7.  The ALJ may

11   disregard the treating physician's opinion whether or not that opinion is contradicted.

12   *Magallanes*, 881 F.2d at 751; *Cotten v. Bowen*, 779 F.2d 1403, 1408 (9th Cir. 1986).

13        Where a treating physician's opinion is not contradicted by another physician, however,

14   it may be rejected only for "clear and convincing" reasons supported by substantial evidence in

15   the record.  *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  When rejecting

16   uncontraverted medical opinions the ALJ must explain his reasons for rejecting them in proper

17   detail.  *Embrey v. Bowen*, 849 F.2d, 418, 421-22 (9th Cir. 1988).  An ALJ must defer to a

18   treating physician's opinion, even if controverted by other medical opinions, unless the ALJ

19   provides specific and legitimate reasons based on substantial evidence in the record.  *Andrews*,

20   53 F.3d at 1043; *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983).  The ALJ can meet this

21   burden by setting out a detailed and thorough summary of the facts and conflicting clinical

22   evidence, stating his interpretation thereof and making findings."  *Magallanes*, 881 F.2d at 751.

23        The ALJ did not meet his burden in this case.  Instead, the ALJ rejected Dr. Meggert's

24   conclusions without explanation, other than deciding to give more weight to the ME's testimony.

25   AR 37-38.  In addition, when the plaintiff's case was first remanded, the plaintiff was seen by

26   Rufino Ramos, M.D., for further examination.  As noted by the ALJ, Dr. Ramos diagnosed the

REPORT AND RECOMMENDATION
PAGE -17

01   plaintiff with an anxiety disorder NOS, alcohol dependence in remission, and the learning and

02   intellectual disorders identified by Dr. Meggert.  He rated the plaintiff's global assessment at a

03   level of serious symptoms and limitations.  AR 37.  However, the ALJ simply dismissed Dr.

04   Ramos's diagnosis, because Dr. Gustavson stated it was simply a summary of other reports and

05   testing, and Dr. Gustavson, the medical expert, found it of little use.  AR 38.  This does not rise

06   to the level of analysis required of the ALJ to dismiss an examining physician's opinion.

07   Moreover, Dr. Gustavson was wrong when he characterized Dr. Ramos's report as simply a

08   summary of other reports and testing.  The record indicates that while Dr. Ramos did summarize

09   the results of prior testing, he also met with the plaintiff, and administered certain tests himself

10   to reach his conclusion that the plaintiff's global assessment of functioning was at a level of

11   serious symptoms and limitations.  AR 473.

12          The ALJ erred by failing to fund deficits of adaptive functioning that manifested

13   themselves by the age of 22.  In light of the fact that plaintiff met the requirements of Listing

14   12.05(C), as described above, he should have been found disabled within the meaning of the

15   Social Security Act.

16          4.     The 12.05(C) Listing does not require a specific diagnosis of "mental
                   retardation."

17

18          The Commissioner argues that a 12.05(C) Listing requires a specific diagnosis of mental

19   retardation, which, she asserts, is lacking in this case.  Dkt. No. 15. Although there are no Ninth

20   Circuit cases that directly address the requirement, the text of the Social Security regulations

21   makes clear that a specific diagnosis of mental retardation is not a pre-requisite to finding that a

22   plaintiff meets or equals the 12.05(C) Listing.  Paragraph A of the mental disorders section

23   explains how the specific listings for each mental disorder are found.  With respect to mental

24   retardation in particular, it states:

25          The structure of the listing for mental retardation (12.05) is different from that of
             the other mental disorders listings.  Listing 12.05 contains an introductory
26           paragraph with the diagnostic description for mental retardation.  It also contains

REPORT AND RECOMMENDATION
PAGE -18

01
02

> four sets of criteria (paragraphs A through D).  If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing.

03
04
05

20 C.F.R. Pt. 404, Ch. III, Subpt. P, App. 1.  Hence, in order to find a 12.05(C) Listing, plaintiff must demonstrate that he satisfies the diagnostic requirements of the introductory paragraph, as well as the criteria set forth in the Listing.  *See, e.g., Foster*, 279 F.3d at 354.

06
07
08
09
10
11
12
13
14
15
16

The introductory paragraph to Listing 12.05 describes the diagnostic requirements for mental retardation as follows:  "[m]ental retardation refers to significantly sub-average general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., [ ] before age 22."  20 C.F.R. Pt. 404, Ch. III, Subpt. P, App. 1, § 12.05.  Nowhere in this paragraph, nor the general introductory paragraph described above, does it state that a diagnosis of "mental retardation" is required to find a 12.05(C) Listing.  Rather, the plain text of the regulation sets forth the characteristics of mental retardation for purposes of the Listing.  Setting forth the characteristics of mental retardation would not have been necessary had the Regulations simply required a doctor to render a diagnosis that used the words "claimant is mentally retarded."

17
18

The ALJ erred in his step 3 analysis.  The plaintiff's impairments met the 12.05 Listing requirements.  This requires a determination that the plaintiff is disabled.

19

C.    The ALJ Erred In His Step 5 Analysis.

20
21
22
23
24
25

Plaintiff also assails the validity of the hypothetical questions the ALJ posed to the vocational expert ("VE"). Dkt. No. 12. He argues that the jobs the VE identified were "precluded by the limitations the ALJ should have found," including plaintiff's difficulty grasping, handling, lifting, and slow pace. Dkt. No. 12. Defendant responds that the ALJ's hypothetical was accurate and argues that plaintiff has given no legitimate reasons for why he cannot perform the jobs the VE identified.  Dkt. No. 20.

26

01       After a claimant has demonstrated that he or she has a severe impairment that prevents

02 them from doing their past relevant work, they have made a *prima facie* showing of disability.

03 *Tacket*, 180 F.3d at 1100-01. The burden then shifts to the Commissioner at step 5 to demonstrate

04 that, in light of the claimant's RFC, age, education, and work experience, they can perform other

05 types of work that exist in "significant numbers" in the national economy.     *Id.*; 20 C.F.R. §

06 404.1560(b)(3).

07       There are at least two ways that the Commissioner can meet her burden at step 5. First,

08 she can use the Medical Vocational Guidelines. 20 C.F.R. Pt. 404, Subpt. P, App. 2. When the

09 Guidelines fail to accurately describe a claimant's limitations, however, the ALJ should not rely

10 on them. *Reddick*, 157 F.3d at 729. Instead, they should use them as a framework in conjunction

11 with testimony from VE. *Tacket*, 180 F.3d at 1101. In this method, the ALJ uses the Guidelines'

12 principles, but has the VE testify as to the claimant's ability to work and the availability of certain

13 jobs that the claimant would be able to perform. *Id.* In such a scenario, the ALJ must provide the

14 VE with an accurate and detailed description of the claimant's impairments, as reflected by the

15 medical evidence of record. *Id.*

16       Here, the ALJ found that the Guidelines could not accurately describe the plaintiff's

17 limitations and thus called a VE to testify. AR 40. The hypothetical the ALJ posed to the VE was

18 scattered, but appears to have included limitations that assumed the plaintiff had a sixth grade

19 education, was functionally illiterate, and had "very low math skills." AR 657-60. After an

20 examination of plaintiff by the VE, the ALJ rephrased the hypothetical to assume "limited

21 interaction" with others, inability to do written or verbal reasoning, ability to do simple and

22 moderately complex repetitive tasks if shown how." AR 660. He also added that he should be

23 limited to light work in an environment with little background noise. AR 660.

24       The ALJ specifically rejected testimony by the VE, made in response to questioning from

25 the plaintiff's attorney, that asked him to assume plaintiff was "slow" and would have difficulty

26 maintaining production standards. AR 663. In response to the question, the VE said there were

REPORT AND RECOMMENDATION
PAGE -20

01  no jobs available that plaintiff could perform.  AR 663.  Because the ALJ's questions did not

02  encompass all of the limitations of the plaintiff, it was an inadequate hypothetical, and must be

03  remanded on this ground alone.  *See Tacket,* 180 F.3d at 1101.

04      However, there is a more serious flaw in the step 5 analysis of the VE.  All of the jobs

05  identified by the VE required level one reading and math abilities.  With respect to the reading in

06  particular, level one requires a person to recognize 2,500 words and read 95 to 120 words per

07  minute.  *See* U.S. Dep't of Labor, *Dictionary of Occupational Titles*, App. C. (4th Ed. 1991),

08  *available at* www.occupationalinfo.org.

09      The ALJ concluded that the plaintiff was functionally illiterate.  In addition, the record

10  abundantly evidences the plaintiff's learning problems.  Because he is not able to read at this level,

11  he would not be able to perform the jobs identified by the VE.  The VE's testimony cannot support

12  a conclusion that there is work for the plaintiff because plaintiff could not actually perform the jobs

13  the VE described.  The fact that plaintiff engaged in work within a similar skill category in the past

14  does not change this fact.  Plaintiff testified that others had assisted him in reading-related tasks

15  in his previous jobs, but there is no reason to believe that would be the case in future work.

16      At step 5, the Commissioner bears the burden of proof to establish that the claimant can

17  perform some other work that exists in significant numbers in the national economy, taking into

18  consideration the claimant's RFC, age, education, and work experience.  20 C.F.R. §§

19  404.1520(f), 416.920(f); *Tackett*, 180 F.3d at 1100.  In this case, the Commissioner failed to

20  satisfy that burden for the reasons set forth above.  In such instances, there is no requirement for

21  a remand for taking additional evidence.  Rather, a remand with directions to calculate disability

22  benefits to be awarded is appropriate.  *McCartey*, 298 F.3d at 1076.

23                          VIII.  <u>CONCLUSION</u>

24      For the reasons set forth above, plaintiff was entitled to a 12.05 (C) Listing at step 3.  In

25  addition, the Commissioner failed in her burden at the step 5 analysis.  For either or both reasons,

26  the final decision of the Commissioner is reversed and this matter is remanded for the purpose of

REPORT AND RECOMMENDATION
PAGE -21

01  calculation of benefits.  If remand for less than calculation of full benefits is ultimately ordered,

02  then the Commissioner should also address the errors in the "severity" analysis at step 2 and the

03  errors in the hypothetical to the VE at step 5, described above.

04        DATED this 2nd day of June, 2005.

06                                                   *James P. Donohue*

07                                                   JAMES P. DONOHUE
                                                     United States Magistrate Judge

REPORT AND RECOMMENDATION
PAGE -22